187 F.3d 1150 (9th Cir. 1999)
 MICHAEL WELLINGTON, an individual, Plaintiff-Appellant,
v.
THE LYON COUNTY SCHOOL DISTRICT, a Lyon County Subdivision; THE LYON COUNTY BOARD OF TRUSTEES, a Lyon County Subdivision; NAT LOMMORI, an individual; DOES I-X, Defendants-Appellees.
 No. 97-17366
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 10, 1999
Filed August 23, 1999
 
 Carl F. Hylin and John N. Schroeder, Reno, Nevada, for the plaintiff-appellant.
 Michael A. Nivinskus and C. Robert Cox, Walther, Key, Maupin, Oats, Cox, Klaich & LeGoy, Reno, Nevada, for the defendants-appellees.
 Appeal from the United States District Court for the District of Nevada Edward C. Reed, Jr., District Judge, Presiding. D.C. No. CV-95-00588-ECR.
 Before: Phyllis A. Kravitch,[1] Stephen Reinhardt, and Thomas G. Nelson, Circuit Judges.
 Opinion by Judge T.G. Nelson
 OPINION
 T.G. NELSON, Circuit Judge:
 
 
 1
 Michael Wellington appeals the district court's grant of summary judgment in favor of the Lyon County School District ("School District") on his claim that the School District violated the Americans With Disabilities Act of 1990 (the "ADA"), 42 U.S.C. SS 12101-12231, when it terminated his employment. We have jurisdiction under 28 U.S.C.S 1291. We reverse.
 
 I.
 
 2
 Wellington was hired to perform maintenance for the School District in 1989. In August 1992, he developed carpal tunnel syndrome due to the repeated motion with tools and pulling on his wrists that he encountered in his maintenance position. The carpal tunnel syndrome caused pain, weakness and numbness in Wellington's hands, arms and shoulders. In September 1992, Wellington went on worker's compensation leave under the Nevada State Industrial Insurance System ("SIIS").
 
 
 3
 For the first few months Wellington was on leave, he regularly golfed and bowled. Wellington's doctor then advised him to not participate in these activities, and Wellington stopped. In January 1993, Wellington underwent surgery to alleviate his condition, and in March 1993, he was released by his doctor to return to work.
 
 
 4
 By August 1993, Wellington's symptoms returned, and he again went on SIIS leave. While on leave the second time, he was examined by Dr. Christensen who determined that even with additional surgery, Wellington would be permanently limited to "lighter type activities." Dr. Christensen prescribed limitations on the lifting activity Wellington could engage in at work as follows:
 
 
 5
 "occasional" (i.e. 1% to 33% of an eight hour work day) lifting of 20 pounds; "frequent" (i.e. 34% to 66% of an eight hour work day) lifting of 10 pounds; avoid highly repetitive activities.
 
 
 6
 In accordance with these limitations, when Wellington returned to work for the School District in the spring of 1994, he was assigned to fill temporary light duty positions. Wellington was initially assigned a "mail run" job as a courier, and was later assigned to assist in setting up a school district safety program.
 
 
 7
 On June 21, 1994, SIIS wrote a letter to the School District informing the School District that, in view of the limitations prescribed by Dr. Christensen, Wellington would not be "able to return to [his prior] job unless it is modified." SIIS also informed the School District that if it could not provide an appropriate position for a person of Wellington's physical limitations, Wellington would need to be trained for a new job. SIIS gave the School District thirty days to notify SIIS of its intent to offer Wellington an appropriate position.
 
 
 8
 The Lyon County Board of School Trustees ("Board") met in a closed session on July 12, 1994, to discuss whether Wellington's job with the safety program should be made into a permanent position. At this meeting, School District superintendent Nat Lommori briefly explained Wellington's history and the notice from SIIS stating:
 
 
 9
 We are down to the fish or cut bait time with [Wellington]. We have gotten the notice that we can either offer him a job that meets his essential functions as [SIIS] calls it, or we can have him go away and we will pay for retraining and all of those things in his future until he is permanently employed some where else.
 
 
 10
 Lommori also mentioned that there were some concerns surrounding Wellington's claim of a disability, explaining:
 
 
 11
 Let me tell you, we've questioned [his injury caused by carpel tunnel syndrome]. Anyhow, what we can do is I guess we have two options--one we can keep the man and put him in that kind of job he is working now, kind of a light duty position. . . . Then all of the training and everything else will still be on us but at least we would get the benefit of that. The only prob lem I have, and I've discussed this with [Welling ton], is over this last two year period of time he has had two major times off. His first time off we had some problems because he was bowling and playing golf. We're not doctors, but we are telling you perception-wise you're killing yourself with your fellow employees when you're out there doing these kinds of activities and out with that kind of an injury.
 
 
 12
 Lommori acknowledged to the Board that there were certain benefits, as well as drawbacks, to having Wellington fill a safety position:
 
 
 13
 [T]here are some positives to that because [Welling ton] has knowledge of construction trades and he could go around to all of our schools and help them understand where we have some unsafe conditions and such and how we can improve that. That would be playground equipment, all those kinds of things, bleachers and such. The negative part of this, though, is I think that he is going to have a problem with some of his fellow employees in the district because there have been several of them that think he's milked the system and he kind of hurt himself in their eyes and he would have to overcome that. I've talked to him about that--if we even consider [him] that would be a problem.
 
 
 14
 When asked whether the Board would be creating a job to find a position for Wellington, Lommori replied:"This is creating a job. One way or the other we are creating a job. But it's one job that we need to have done in this district right now."
 
 
 15
 Another administrator, Mary Goodman, mentioned other benefits to hiring Wellington for the safety position, stating:
 
 
 16
 His attitude has been very good since he has been back and he's really done a lot of research finding out exactly what OSHA requirements are and what not, and he is becoming quite knowledgeable already in what we need to do and he has somewhat of a rap port with the OSHA representatives.
 
 
 17
 A member of the Board also expressed his support for Wellington, stating that despite the appearance that "he was milking the system," Wellington is a loyal employee. I do believe [Wellington ] will give you 110% and as I understand it a lot of what was happening was the doctors telling him you can't go to work, but do what you want to do. I think he made a mistake by bowling and golfing. I agree with you wholeheartedly, but by the same token he was told not to go to work. The point I am trying to make is I like [Wellington]. When he was working full time he was a dedicated employee.
 
 
 18
 Another member of the Board also expressed his approval for hiring Wellington for the safety position, stating: "If you go along with a program like this what you do is you do tend to spend an equal amount of money in training, but you receive a loyal employee. I don't think our chances of losing are very good. Our chances of winning are very good."
 
 
 19
 Despite all of the positive considerations expressed for placing Wellington in a permanent safety position, at least one Board member expressed reservations, asking: "What's the possibility of setting a precedent for another employee to decide, `well, I'll get myself a cushy job.' "
 
 
 20
 At the end of the meeting, the Board had failed to reach a consensus on whether to hire Wellington for a permanent safety position, and the matter appears to have been left in the hands of Lommori. Lommori ultimately decided not to offer Wellington a permanent position in the safety program, and Wellington's employment with the School District was terminated on July 20, 1994.)[2]
 
 
 21
 On July 26, 1994, the Board held another meeting where it followed up on Wellington's case. At this meeting, Lommori reported:
 
 
 22
 After a week of deliberation in my office of listening to several folks, I decided it would be best for the entire district not to offer the position and have [Wellington] go into SIIS and get into the rehab/ retraining program. It appeared that there was enough concern with our other folks already in the district. I don't want to put a pebble in everybody's shoe and have them get a blister over this whole thing when I think things are going pretty well in thedistrict. I just don't want to upset the apple cart.
 
 
 23
 In August 1994, Wellington filed a complaint with the Nevada Equal Rights Commission. After receiving a right to sue letter, he filed a complaint in district court alleging that the School District violated the ADA when it terminated his employment. The district court granted summary judgment in favor of the School District. Wellington timely appeals.
 
 II.
 
 24
 A grant of summary judgment is reviewed de novo . Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998). Summary judgment is proper only if, viewing the evidence in the light most favorable to the party opposing the motion, the court finds that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. See Thompson v. Holy Family Hosp., 121 F.3d 537, 539 (9th Cir. 1997). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
 
 III.
 
 25
 To survive a motion for summary judgment on his ADA claim, Wellington must be able to show sufficient facts to meet his burden of production of evidence on each element of the prima facie case. See Willis v. Pacific Maritime Ass'n, 162 F.3d 561, 565 (9th Cir. 1998). Specifically, Wellington must show: (1) that he was disabled within the meaning of the ADA; (2) that he was "qualified," meaning he was able to perform the essential functions of the job at issue, with or without a reasonable accommodation; and (3) that the employer terminated him because of his disability. See id. It is undisputed that Wellington was terminated because of his physical limitations. Therefore, the only questions are (1) whether he was "disabled" due to his physical limitations, and (2) whether he was "qualified."
 
 A. "Disability" Under the ADA
 
 26
 Wellington must first demonstrate that he is disabled within the meaning of the ADA. The ADA defines "disability" as including "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. S 12102(2)(A). Wellington argues that his physical impairment resulting from carpal tunnel syndrome qualifies as a disability pursuant to the ADA because it substantially limits his ability to engage in the major life activity of working.
 
 
 27
 To show a substantial limitation on his ability to work, Wellington must show that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. " 29 C.F.R. S 1630.2(j)(3)(i). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.
 
 
 28
 In Thompson, the plaintiff, a registered nurse, was permanently restricted "from lifting more than 25 pounds on a continuous basis, more than 50 pounds twice a day, and more than 100 pounds once a day." See 121 F.3d at 539. Due to the restrictions on her lifting, the plaintiff could not perform her job of providing total patient care and was therefore terminated from her employment. Although we recognized that lifting was a "major life activity," we held that the plaintiff's lifting restrictions were not, in and of themselves,"substantially limiting" within the meaning of the ADA. See id. at 53940.
 
 
 29
 As to the extent to which these lifting restrictions curtailed the plaintiff's ability to engage in the "major life activity" of working, we held that the plaintiff had failed to establish that the limitation on her general ability to work was "substantial." See id. at 540.
 
 
 30
 Thompson points to no evidence that the restrictions on her ability to perform total patient care preclude her from engaging in an entire class of jobs. Nor does she offer the information relevant to this particularized determination. The only evidence in the record addressing Thompson's experience and opportunities is the affidavit of a vocational rehabilitation counselor that was submitted by the hospital. After stating his belief that total patient care is not an appropriate assignment for an individual with a 25 pound exertional limitation, the counselor notes that Thompson would be qualified for a number of the positions available to registered nurses in the [local] labor market. Thompson has not countered this suggestion with evidence of a significant decline in her ability to obtain employment. Indeed, while no longer performing total patient care, she currently is employed in the health care industry.
 
 
 31
 Id. (citations omitted).
 
 
 32
 In the present case, the evidence indicates that Wellington's education is limited to a high school degree with some trade school certification, and his work experience is limited to manufacturing, construction, heavy maintenance and plumbing. No expert or other evidence has been presented to suggest that there are jobs available in the labor market for which a person having "comparable training, skills and abilities" to Wellington would be qualified. To the contrary, the undisputed evidence from Wellington's doctor is that Wellington is permanently unable to perform work involving "metal fabrication, welding, . . . heavy activities, carpentry, . . . the use of a variety of tools to do maintenance and repairs, et cetera." Furthermore, Wellington's testimony establishes that he had to quit a job performing even light plumbing because he "was in too much pain to even continue."[3]
 
 
 33
 These facts suggest that Wellington may be precluded from working in any capacity involving construction, maintenance or even light plumbing. Considering Wellington's "training, skills and abilities," there exists a question of fact as to whether he is "significantly restricted in the ability to perform work in a class of jobs"--construction, maintenance and plumbing--and whether he is thus "disabled " within the meaning of the ADA. See 42 U.S.C. S 12102(2); 29 C.F.R. S 1630.2(j).
 
 B. "Qualified" Under the ADA
 
 34
 If Wellington is able to demonstrate that he is "disabled" within the meaning of the ADA, he must next show that he is "qualified." See Willis , 162 F.3d at 565. A "qualified" individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. S 12111(8). The district court held that Wellington failed to demonstrate that he was "qualified" to perform the essential functions of the maintenance position, and Wellington does not appeal that decision. Wellington contends, however, that placing him in a permanent position in the safety program would have been a reasonable accommodation.
 
 
 35
 A "reasonable accommodation " under the ADA may include "job restructuring . . . reassignment to a vacant position . . . and other similar accommodations." 42 U.S.C. 12111(9). A "reasonable accommodation" has not, however, been held to include creation of a new job. To the contrary, we have recently held that the ADA does not impose a duty to create a new position to accommodate a disabled employee. See Willis v. Pacific Maritime Ass'n, 162 F.3d 561, 567 (9th Cir. 1998) ("In order for reassignment to a vacant position to be reasonable, an existing position must be vacant: there is no duty to create a new position for the disabled employee.").
 
 
 36
 While the School District did not have a duty to create a new position to accommodate Wellington's physical limitations,the record reveals a question of fact as to whether the safety position had already been created prior to termination of Wellington's employment. A job description for the position of "Safety Aide" was drafted, superintendent Lommori was authorized by the Board of Trustees to hire someone for that position, and Lommori testified in his deposition that the Board "did allow the position but it [was Lommori's] decision" whether or not to offer it to Wellington. In fact, when asked in his deposition whether a light duty safety aide job was created, Lommori responded: "Position was created."
 
 
 37
 Comments made in the closed Board meetings also suggest that such a position may have been created. After Lommori explained to the Board the option of permanently placing Wellington in a safety position, one Board member asked: "Are you creating a job to do this?" Lommori responded, "This is creating a job. One way or another we are creating a job. But it's a job that we need to have done in this district right now."
 
 
 38
 In a subsequent Board meeting, Lommori reported:
 
 
 39
 We talked about the position of a Safety person at the last meeting. Essentially the Board gave me the authorization to make that decision to create the job or not . . . . I decided it would be best for the entire district not to offer the position and have [Wellington] go to SIIS and get into a rehab/ retraining program.
 
 
 40
 After his report, one member of the Board asked:
 
 
 41
 The question I have on that is now are we going to go ahead and look for someone for that position or are we going to handle this? We literally made a position there, didn't we?
 
 
 42
 Lommori acknowledged the importance of the proposed safety position by affirmatively responding: Oh, I think we are eventually going to find a person for that position because it is an important position. It is not a program that's going to go away. We have to have a safety program and I think that we've done a lot of work and [Wellington] did a lot of good work. I told him that I was pleased with the work he did. I'm going to try to go for a much lesser paid position.
 
 
 43
 The transcripts of these Board meetings and Lommori's deposition raise an issue of fact as to whether the safety position may have already been created prior to Wellington's termination. Although there is some evidence suggesting a contrary conclusion, when viewing the evidence in the light most favorable to Wellington, there is sufficient evidence that a reasonable jury could conclude that a permanent safety position was created prior to Wellington's termination. Moreover, if a permanent safety position was created, issues of fact exist as to whether Wellington was "qualified" for the position and thus whether it would have been a reasonable accommodation to reassign Wellington to that position. See 42 U.S.C. 12111(9).
 
 
 44
 Finally, Wellington might establish at trial that although the safety position was not actually created, the reason that the School District did not follow through on its initial decision to do so was Wellington's disabled status and the feared adverse reaction of his fellow employees. This too, if proven, could provide a basis for a reasonable jury's concluding that the School District failed to make a reasonable accommodation.
 
 IV.
 
 45
 Viewing the evidence in the light most favorable to Wellington, genuine issues of material fact exist concerning Wellington's ADA claim. First, considering Wellington's "training, skills and abilities," there exists a question of fact as to whether he has a "physical . . . impairment that substantially limits" his ability to work, and thus, whether he is disabled within the meaning of the ADA. Second, the record presents a genuine issue of material fact as to whether a permanent safety position had been created and, if such a position had been created, whether Wellington was "qualified" for the position, and thus, whether it would have been a reasonable accommodation to reassign Wellington to that position.
 
 
 46
 In sum, based on the record, a reasonable jury could determine that Wellington was disabled and that the School District failed to reasonably accommodate his disability solely because it did not want to provide a "cushy job " to someone perceived by other employees as having "milked the system."
 
 
 47
 REVERSED AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Honorable Phyllis A. Kravitch, Senior Circuit Judge for the Eleventh Circuit United States Court of Appeals, sitting by designation.
 
 
 [2]
 At one point, Lommori was apparently very close to offering Wellington the position, evidenced by the fact that a letter, dated July 14, 1994, informing SIIS of the decision to hire Wellington for the position was drafted. This letter was, however, never mailed. In his deposition, Lommori admitted that he was close to offering Wellington the position, but then changed his mind. The safety position has apparently never been filled.
 
 
 [3]
 After his employment with the School District was terminated, Wellington obtained employment in a light plumbing position. Wellington stated in his deposition that he eventually quit this position because he "was in too much pain to even continue."